IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| KATRINA GOLDEN | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO. 1:21-00481-KD-B |
| | ) | |
| | ) | |
| STATE FARM FIRE AND CASUALTY | ) | |
| COMPANY | ) | |
| | ) | |
| Defendant. | ) | |

### Order

This matter is before the Court on the Motion for Summary Judgment filed by Defendant State Farm Fire and Casualty Company (Doc. 23), the Response by Plaintiff Katrina Golden (Doc. 30), and Defendant's Reply (Doc. 32); Defendant's Motion to Exclude Expert Testimony (Doc. 25), Plaintiff's Response (Doc. 29), and Defendant's Reply (Doc. 31).

**II.     Findings of Fact[1]**

Plaintiff Katrina Golden ("Golden") entered into an insurance contract (the "Policy") with Defendant State Farm Fire and Casualty Company ("State Farm") with a policy period from May 7, 2020 – May 7, 2021, to insure Golden's property at 26890 Cabinet Shop Rd, Loxley, AL, 36426 (the "Property"). (Doc. 24-1 at 2). Under the Policy, "accidental direct physical loss" to the dwelling and other structures is covered unless an exclusion applies. (Doc. 24-1 at 21). On

---

[1] The facts are taken in the light most favorable to the non-movant. Tipton v. Bergrohr GMBH–Siegen, 965 F.2d 994, 998–999 (11th Cir. 1992). The "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." Priester v. City of Riviera Beach, 208 F.3d 919, 925 n. 3 (11th Cir. 2000).

September 16, 2020, Hurricane Sally caused damage to the Property and Golden filed a claim with State Farm shortly thereafter.

On October 5, 2020, State Farm sent an assigned claims handler, Jeffrey Whaley ("Whaley"), to the Property to meet with Golden and inspect the damage caused by Hurricane Sally. At the inspection, Golden identified damage to the "garage doors, the roof, the vinyl, the ceilings, [and] the windows" which she attributed to Hurricane Sally. (Doc. 30-1 at 17). Whaley noted, in his report, that a "full roof replacement [was] warranted," there was damage to some "vinyl siding, window wrap…, metal fascia, [two windows]…and ceiling tiles." (Doc. 24-2 at 19). On October 27, 2020, State Farm initially authorized repairs for:[2]

Exterior

- Remove and replace asphalt shingle roofing system, including installation of various code items and replacement of flashing, roof vent, and furnace vent (SF 0467-0469).
- Remove and replace vinyl siding, window wrap and trim on the right elevation (SF 0470).
- Remove and replace fascia and re-glaze two windows on the rear elevation (SF 0470).
- Remove and replace fascia and a garage door and hardware on the left elevation (SF 0471).
- Detach and reset vinyl soffit in the garage interior (SF 0470).

Interior

- Remove and replace acoustic ceiling tile in the kitchen due to water damage, clean floor, paint crown molding, install blown-in insulation in ceiling (SF 0466).
- Remove and replace acoustic ceiling tile in the back left bedroom due to water damage, clean floor, paint crown molding, install blown-in insulation (SF 0466-0467).

---

[2] This information comes from State Farm's MSJ. It summarizes their initial estimate in detail and Golden cites to it in their response in agreement. (Doc. 24 at 5; Doc. 30 at 2).

This initial estimate for repairs in the amount of $19,624.19 did not exceed the deductible[3] and applicable depreciation pursuant to the Policy. (Doc. 24 at 6; Doc. 30 at 2). On October 28, 2020, Whaley revised the estimate to include additional damages, such as the insulation, demolition, light fixtures, a ceiling fan, vents, and crown molding. (Doc. 24 at 6; Doc. 30 at 2). This revised estimate for repairs in the amount of $24,088.47 did not exceed the deductible and applicable depreciation pursuant to the Policy.

On December 2, 2020, Golden called State Farm to provide notice that she received an estimate on a window repair that exceeded the estimate State Farm Provided. (Doc. 24-2 at 14-15). State Farm agreed to increase their estimate for repairing the glass to the window to match the price Golden was quoted. (Doc. 24-2 at 13). Golden also told State Farm that she found additional damages and was going to have a contractor come inspect the Property. (Doc. 24-2 at 15). Prior to submitting claims for additional damage, the roof and garage of the Property were repaired and State Farm issued payment to Golden in the amount of $10,037.40 on March 9, 2021. (Doc 24-2 at 10-11).

On April 14, 2021, Golden's attorney, Smith Prestwood, sent a damage estimate (prepared by Resolved Group, LLC) to State Farm requesting $175, 330.74. (Doc. 24-2 at 10). The Resolved Group estimate[4] included damage to "vinyl siding, window wrap, facia, interior ceiling tiles, insulation, light fixtures, a ceiling fan, vents, and crown molding." (Doc. 30 at 2). State Farm responded to Prestwood and requested to re-inspect the Property and an inspection was scheduled for April 28, 2021. (Doc. 24-2 at 8). Representatives of Resolved Group, LLC,

---

[3] The deductible of the Policy is $13,405.
[4] Doc. 24-2 at 96 is a summary of the repairs in the Resolved Group estimate.

Andy Boutwell, and State Farm, Walter Jackson, were present at the reinspection. Boutwell and Jackson reviewed the damages attributed to Hurricane Sally in the Resolved Group Estimate.

After the reinspection, State Farm sent William Creeden of Rimkus Engineering to inspect the Property to better determine, most notably, whether the damage to the windows and brick veneer was attributable to Hurricane Sally. (Doc. 24-2 at 6). Creeden's report from June 9, 2021, concluded that:

1. There were three windows with broken glass. We could not rule out that the glass was broken by wind pressure or windborne-debris impacts associated with Hurricane Sally.

2. The total of 10 window units located on all sides of the building with fogged glass was the result of long-term deterioration of the windows and was not the result of a single storm event.

3. The small cracks in the brick veneer were the result of long-term differential movement between the veneer and framed wall, and they were not the result of a storm event.

Doc. 24-5 at 9.

State farm then revised its estimate to include: A) "two broken windowpanes…[and B] overhead and profit…with the exception of the roof since a general contractor was not used…" (Doc. 24 at 14; Doc. 30 at 3). State Farm's revision resulted in an additional $19,481.07 being paid to Golden on July 3, 2021. (Doc. 24-2 at 3).

On July 21, 2021, Golden disclosed to State Farm that she retained Christopher Matthews of GCI Consultants, LLC ("GCI") as an expert to highlight the correlation between Hurricane Sally and the damage sustained to the glazing system assemblies.[5] (Doc. 24-7 at 17). GCI's

---

[5] Glazing system assemblies include the glass in windows, doors, etc.

4

examination included "every accessible exterior door and window assemblies." (Doc. 24-7 at 17). The GCI estimate and report concluded that all windows and doors at the property:

> were exposed to similar damaging wind forces that could cause concealed internal damage and damage at locations that were not visually observed. In most cases, the performance of these assemblies has been reduced, and thus they are vulnerable to future wind events that may occur during typical afternoon thunderstorms. In addition, the aesthetics of the assemblies may have been altered.

Doc. 24-7 at 20.

In his deposition, Mathews noted that one of the three windows with broken glass had an interior break, which precluded Hurricane Sally as the originating cause. (Doc. 24-7 at 16). Also, only one window had hardware damage and Mathews pointed out that it could have been caused by either Hurricane Sally or "[s]ome operation type issue with the window itself." (Doc. 24-7 at 15). Yet, Matthews concluded that the damage to "the insulated glass seals, the glass stop damage, and the frame joint damage" was caused by Hurricane Sally. (Doc. 29-1 at 25).

On April 6, 2022, State Farm's expert, Joseph Asarisi, inspected the Property with Jason Nezat of Resolved Group and Prestwood present. Asarisi's report concluded that:

- The brick veneer on the exterior of the residence was not damaged by the hurricane.
- The loose soffit trim on the garage is due to long term deterioration.
- The three punctures in the vinyl siding on the east exterior elevation of the garage were caused by windborne debris.
- The cracked and broken vinyl siding is due to long-term deterioration.
- The rear door of the house was not damaged by the hurricane.
- The missing breezeway ceiling fan blade was not caused by the wind during the storm.
- The broken window on the rear of the house was possibly caused by windborne debris during Hurricane Sally.
- The cracked windowpane on the rear of the house was possibly caused by windborne debris from the storm.
- The discoloration of the breezeway vinyl ceiling was not caused by the hurricane.
- The section of patched vinyl ceiling in the breezeway was likely blown out by the winds during Hurricane Sally.
- None of the broken seals on all the double pane windows were caused by the hurricane.
- There were moisture stains on the hallway and den ceilings. According to Katrina Golden's deposition, the stained interior ceiling tile in the den appeared a couple of days after the hurricane and was a result of moisture intrusion. Since the roof had been replaced, it could not be determined if the stains were caused by a damaged roof from the hurricane.
- The interior loose ceiling tiles are a result of differential pressure between the attic and interior of the house.
- The scraped and broken ceiling tiles were caused by ongoing construction inside the residence since there is no record of debris entering through the roof.
- The damaged and missing portions of vinyl ceiling tiles inside the garage were caused by wind after the garage doors blew in during the hurricane.
- The five small punctures in the vinyl siding covered wall on the interior south wall were caused by windborne debris after the garage doors blew in during the hurricane.

Doc. 24-8 at 13.

Asarisi also concluded that the damages listed in the Resolved Group estimate were "excessive" and that the majority of the claimed window damage did not result from Hurricane Sally. (Doc. 24-8 at 19). Consequently, State Farm did not revise its estimate following Asarisi's inspection of the Property.

**II.     Defendant's Motion to Exclude Expert Testimony of Christopher Matthews**

State Farm moves to exclude the report and deposition testimony of Plaintiff's expert witness, Christopher Matthews ("Matthews"), as failing to satisfy the minimum Rule 702 and 703 admissibility standards under the Federal Rules of Evidence. As grounds, State Farm argues that: 1) Matthews' opinion regarding the Hurricane Sally damage that the Property incurred is not based on his independent knowledge but instead the opinions' of others; 2) Matthews does not have the appropriate foundation of facts or data upon which an expert would reasonably rely; and 3) Matthews lacks material involvement in the investigation of the Property. (Doc. 25 at 11-12).

In contrast, Golden argues that: 1) the framework of Matthews' report was developed and typed by him; 2) Matthews supervised all aspects of the report; 3) the opinions in the report are those of Matthews; and 4) Matthews' opinion and the report are supported by an appropriate foundation of facts or data. (Doc. 29 at 1-3).  In reply, State Farm argues that Matthews' deposition proves that the GCI report's "conclusions are not based on facts or data collected by a CGI inspector, but instead are all based on [Matthews' coworker's] opinions, possibly the opinions of other employees of GCI [], and possibly an automated function of an iPad application," and that therefore "Matthews could not possibly form an independent opinion as to the existence or not of any damage on Plaintiff's property." (Doc. 31 at 3).

**A.     Standard of Review**

7

"While Federal Rules of Evidence 401 and 402 provide for the liberal admission of relevant evidence, Rules 403, 702, and 703 mitigate against this general policy by giving trial courts discretion to exclude expert testimony that is either unreliable or irrelevant." Johnson v. Louisville Ladder, 2008 WL 5122261, 7 (S.D. Ala. Nov. 14, 2008) (citing Allison v. McGhan Med. Corp., 184 F.3d 1300, 1310 (11th Cir. 1999). Rule 702 governs the admission of expert testimony in federal court, and provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Applying these principles, expert testimony may be admitted if three (3) requirements are met. Louisville Ladder, *supra* (citing Tuscaloosa v. Harcros Chem., Inc., 158 F.3d 548, 562 (11th Cir. 1998)). First, the expert must be qualified to testify competently regarding the matter he intends to address. Id. at *7. Second, the methodology by which the expert reaches his conclusion used must be sufficiently reliable as determined by a Daubert inquiry. Id. Third, the testimony must assist the trier of fact through the application of scientific, technical, or specialized expertise to understand the evidence or determine a fact in issue. Id. Kilpatrick, 613 F.3d at 1335. And "[t]he proponent of the expert testimony bears the burden of showing, by a preponderance of the evidence, that the testimony satisfies each prong." Hendrix ex rel. G.P. v. Evenflo Co., Inc., 609 F.3d 1183, 1194 (11th Cir. 2010).

For reliability, courts look to the following: 1) whether the expert's methodology has been tested or is capable of being tested; 2) whether it has been subjected to peer review and publication; 3) the known or potential rate of error of the theory or technique; and 4) whether the technique has

8

been generally acceptedin the proper scientific community. See, e.g., Phillips v. America Honda Motor Co., Inc., 238 Fed. Appx. 540 (11th Cir.2007) (excluding expert testimony where there was no reliable link between the expert's data and the facts in the case). "[W]here [expert] testimony's factual basis, data principles, methods, or their application are called sufficiently into question ... the trial judge must determine whether the testimony has a 'reliable basis' in the knowledge and experience of [the relevant] discipline." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 119 (1999). This "'gate-keeping' inquiry must be tied to the facts of a particular case." Id. The expert's testimony must be helpful to, or "fit" with, the factual issues to be resolved -- i.e., the district judge must determine whether the expert's reasoning and methodology can be properly applied to the facts. Daubert, 509 U.S. at 591–592. Trial courts must screen expert testimony to ensure that it is both reliable and that it "relate[s] to any issue in the case" (*i.e.*, "fit"). Id. at 590–591. District courts "have substantial discretion in deciding how to test an expert's reliability ...." Rink v. Cheminova, Inc., 400 F.3d 1286, 1292 (11th Cir. 2005) (citing United States v. Majors, 196 F.3d 1206, 1215 (11th Cir.1999) (internal citation omitted).

For relevance and Rule 702, "it is the responsibility of the trial judge to ensure that an expert is sufficiently qualified to provide expert testimony that is relevant to the task at hand and to ensure that the testimony rests on a reliable basis." Beaudette v. Louisville Ladder, Inc., 462 F.3d 22, 25 (1st Cir. 2006) (excluding expert testimony). As for relevance,

> ... the *Daubert* Court imposed a special relevancy requirement.... To be admissible, expert testimony must be relevant not only in the sense that all evidence must be relevant ... but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue.... In other words, Rule 702, as visualized through the *Daubert* prism, "requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility"....

9

Ruiz–Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 81 (1st Cir.1998) (citations and quotations omitted). Likewise, a court must always keep in mind the maxim that expert testimony must "assist the jurors in deciding the particular issues in the case." Kumho, 526 U.S. at 156–157. Expert testimony is thus excludable when the factual bases are unsupported and/or the testimony will not assist the jury. See, e.g., Davidov v. Louisville Ladder Group, LLC, 2005 WL 486734, *2 (S.D.N.Y. Mar. 1, 2005) (excluding expert report that was inconsistent with facts of case).

> Rule 703 governs the permissible bases for an expert's opinion testimony and provides:
>
> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.
> Fed. R. Evid. 703.

"Federal Rule of Evidence 703 permits an expert to base an opinion on facts or data not admissible in evidence if it is of a type reasonably relied upon by experts in that particular field. Fed. R. Evid. 703. An expert, however, may not simply repeat or adopt the findings of another expert without attempting to assess the validity of the opinions relied upon. In re TMI Litig., 193 F.3d 613, 715–16 (3d Cir.1999) (finding blind reliance by expert on other expert opinions demonstrates flawed methodology under Daubert ); TK–7 Corp. v. Estate of Barbouti, 993 F.2d 722, 732–33 (10th Cir.1993) (excluding expert opinion relying on another expert's report because witness failed to demonstrate a basis for concluding report was reliable and showed no familiarity with methods and reasons underlying the hearsay report). Particularly when parties do not have the opportunity to examine the information relied upon, courts must ensure that an expert witness is sufficiently familiar with the reasoning or methodology behind the information to permit cross-

examination. TK–7 Corp., 993 F.2d at 732." In re Polypropylene Carpet Antitrust Litig., 93 F. Supp. 2d 1348, 1357 (N.D. Ga. 2000).

**B.    Issues**

As there is no apparent dispute as to Matthew's qualifications, the Court will address the reliability, relevance, and basis of his opinions.[6] In sum, State Farm substantively argues that Matthews does not have the appropriate foundation of facts or data upon which an expert would reasonably rely since he reviewed photograph's and notes taken during CGI's inspection to help form the basis of his opinion.[7] [8]

First, the Court will consider how the CGI report was prepared and whether the basis of Matthews' opinion is reliable. Pursuant to Matthews' direction, Nicholas Campbell (an inspector for CGI) physically examined the Property and took photographs while including keynotes correlated to the pictures. (Doc. 29-1 at 5). Then, also directly under Matthews' management, Rolando Tato (a project manager for CGI) used the data collected by Campbell and did the "report preparation" and "compiling work." (Doc. 29-1 at 4-5). Last, Matthews "supervised the preparation of the report [] and reviewed everything in [the report]" to form his opinion. (Doc. 24-7 at 3).[9] Thus, Matthews relied on the data compiled and organized by his subordinates under his management to form the basis of his opinion and produce the CGI report.[10] Matthews is not acting

---

[6] The methodology of how Matthews' reached his opinion was not challenged by State Farm.
[7] State Farm cites to many pages of Matthews' deposition that have not been provided. Most notably, State Farm claims that Matthews admitted to not preparing the opinions in the CGI Report, but the page they cite to in his deposition, pg. 27 lines 19-22, are not provided. (Doc. 25 at 3).
[8] The Court notes that the parties' memorandums were replete with wholly improper citations and citations to deposition excerpts that were not provided to the Court.
[9] Per Matthews, neither Tato nor Campbell "produce" reports or provide opinions. (Doc. 24-7 at 7).
[10] Matthews also reviewed weather data to determine the force of wind the Property experienced. (Doc. 29-1 at 8).

11

as a conduit for another's opinion and the process Matthews used in forming his opinion was proper. See, e.g., Woienski v. United Airlines, Inc., 383 F. Supp. 3d 1342, 1348 (M.D. Fla. 2019) ("an expert is permitted to form conclusions by extrapolating from existing data.") (citing Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); Allison v. McGhan Med. Corp., 184 F.3d 1300, 1312 (11th Cir. 1999) ("factors which this and other courts have considered in the *Daubert* analysis are reliance on anecdotal evidence (as in case reports)…"); Bryant v. BGHA, Inc., 9 F. Supp. 3d 1374, 1392 (M.D. Ga. 2014) (permitting opinion of expert who did not personally visit the scene of the incident and did not inspect the hunting tree stand because he relied upon partner's measurements, photos and data); (Companhia Energetica Potiguar v. Caterpillar Inc., 2017 WL 10775768, at *6 (S.D. Fla. June 12, 2017), report and recommendation adopted, 2017 WL 10775767 (S.D. Fla. Dec. 14, 2017)) ("The fact that an expert did not personally inspect the scene of an incident … is not by itself determinative; personal inspections are not necessarily required."). Accordingly, Matthews is deemed reliable to testify about the contents of the CGI report and his opinion as to the cause of damage sustained to the Property's glazing systems.

Next, the Court will consider the relevance of Matthews' testimony and the CGI report. Matthews testimony is directly related to some of the damages the Property sustained during Hurricane Sally. More specifically, Matthews would testify as to Hurricane Sally damage to the glass windows and doors. State Farm and its expert refute that the damage to the windows was caused by Hurricane Sally and instead resulted from normal wear and tear. Clearly, Matthews' testimony concerning the cause of damage to the glazing systems of the Property is relevant and would assist a jury in reaching their conclusion. See, e.g., Kumho, 526 U.S. 137, 156, 119 S. Ct. 1167, 1178, 143 L. Ed. 2d 238 (1999) (a court must always keep in mind the maxim that expert

testimony must "assist the jurors in deciding the particular issues in the case."); Woienski v. United Airlines, Inc., 383 F. Supp. 3d 1342, 1348 (M.D. Fla. 2019) ("cross-examination, contrary evidence, and instruction on the burden of proof are the proper tools for challenging questionable expert evidence.") (citing Rosenfeld v. Oceania Cruises, Inc., 654 F.3d 1190, 1193 (11th Cir. 2011)). Accordingly, the Court finds that Matthews' testimony will be helpful to the jury.

As such, State Farm's motion to exclude Matthews as an expert witness (Doc. 25) is **DENIED**.

### III.   Standard of Review on Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Rule 56(c) provides as follows:

> *(c) Procedures*
> *(1) Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> *(2) Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>
> *(3) Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.
>
> *(4) Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

FED. R. CIV. P. Rule 56(c).

The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). If the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323. "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992).

**IV.    Applicable Law**

The Policy does not contain an express choice of law provision. The Policy was issued and delivered to Golden in Alabama. The incident giving rise to the insurance claim occurred in Alabama. Accordingly, Alabama law applies to the interpretation of the policy. See Stovall v. Universal Construction Co., 893 So.2d 1090 (Ala. 2004) ("In a contractual dispute, Alabama law would have us first look to the contract to determine whether the parties have specified a particular sovereign's law to govern. Cherry, Bekaert & Holland v. Brown, 582 So.2d 502, 506 (Ala. 1991). Lacking such a contractual specification, we follow the principle of *lex loci contractus,* applying the law of the state where the contract was formed. Brown, 582 So.2d at 506. That state's law then governs unless it is contrary to the forum state's fundamental public policy. Id. at 506–07.").

14

Since "general rules of contract law and interpretation govern the interpretation of an insurance policy, Twin City Fire Ins. Co. v. Alfa Mut. Ins. Co., 817 So.2d 687, 691 (Ala. 2001), the [C]ourt must assign the insurance policy its clear and plain meaning and interpret it to give effect to all terms and provisions. See Brewbaker Motors, Inc. v. Belser, 776 So.2d 110, 112 (Ala. 2000); Bd. of Water & Sewer Comm'rs of Mobile v. Bill Harbert Constr. Co., 870 So.2d 699, 710 (Ala. 2003). If an insurance policy is ambiguous, or its meaning is in doubt or uncertain, it is construed against the insurer. Scottsdale Ins. Co. v. National Security Fire and Casualty Ins. Co., 741 So.2d 424, 426, 427 (Ala. Civ. App. 1999)." Cont'l Cas. Co. v. Alabama Emergency Room Admin. Servs., P.C., 623 F. Supp. 2d 1290, 1294 (M.D. Ala.), aff'd, 355 F. App'x 332 (11th Cir. 2009).

**V.     Analyses**

### A. Breach of Contract

Golden asserts a breach of contract claim in Count 1 of the Complaint. State Farm argues this claim is due to be dismissed because they did not breach the insurance contract and instead handled the underlying claim pursuant to their contractual obligations.

Under Alabama Law, a plaintiff must prove four elements to recover on a breach of contract claim: "'(1) the existence of a valid contract binding the parties in the action, (2) [their] own performance under the contract, (3) the defendant's nonperformance, and (4) damages.'" Employees' Benefit Ass'n v. Grissett, 732 So.2d 968, 975 (Ala. 1998) (quoting Southern Med. Health Sys., Inc. v. Vaughn, 669 So.2d 98, 99 (Ala. 1995))." Cong. Life Ins. Co. v. Barstow, 799 So. 2d 931, 937 (Ala. 2001); see also Arrington v. Wells Fargo, 842 F. App'x 307, 312 (11th Cir. 2020).

State Farm argues that Golden's breach of contract claim is due to be dismissed because "no expert witness has testified that [the] damages/repairs are related to Hurricane Sally." (Doc. 24 at 24). Yet, Golden responds that Jason Nezat of Resolved Group "was disclosed as an expert to testify as to the replacement cost value and actual cash value of the insured loss caused by Hurricane Sally."[11] (Doc. 30 at 3) (citing Doc. 25-1 at 3). In reply, State Farm argues that Nezat "did not include in his expert report [or deposition] any causation opinions." (Doc. 32 at 2).

On review of Nezat's deposition while reviewing the evidence in the light most favorable to the nonmovant, it is clear that Nezat directly attributes at least some of the damage at the Property to Hurricane Sally. (Doc. 30-2 at 17-18) (Nezat expressly stated that the vinyl siding on the house "had dents in it from the storm or from flying debris."). And, the Resolved Group estimate also expressly states that the type of loss was a "Hurricane" and the date of the loss is that of which Hurricane Sally made landfall. (Doc. 30-2 at 32).

Moreover, many of the damages Nezat references in the Resolved Group estimate are included in State Farm's estimate, such as: 1) vinyl siding; 2) ceiling tiles; 3) the roof; 4) soffit; and 5) certain components of the garage. A factual issue, though, is the quantity of the aforementioned damages that need to be replaced, i.e., the necessary amount of vinyl siding to fully repair the Property pursuant to the Policy. A second factual issue that needs to be resolved is the cause of damage to the brick veneer and garage door openings, as these items are included in the Resolved Group estimate but refuted by State Farm and its expert, Asarisi.

Next is the issue of whether the windows, or glazing systems, were damaged by Hurricane Sally. State Farm points to its expert, Asarisi, in support of its contention that the

---

[11] State Farm did not move to exclude Jason Nezat of Resolved Group as an expert and the Resolved Group estimate makes many claims for damages that State Farm refutes by claiming there was no causation testimony by Nezat or the estimate.

damage to the majority of the windows, i.e., fogging between panels and deteriorated seals, is attributable to normal wear and tear. Golden points to its expert, Matthews, to support her contention that the damage to the majority of the windows (aside from a window with an interior break) was caused by Hurricane Sally. Clearly, the parties' experts have a difference in opinion as to the causation of damage to the windows.

Accordingly, there are issues of material fact that remain which must be resolved by a fact finder.[12] Therefore, State Farm's motion for summary judgment on the breach of contract claim fails as a matter of law.

### B. Bad Faith

Golden argues that State Farm acted in bad faith in how the claim was handled. State Farm argues that it had a legitimate reason to dispute coverage, which prevents Golden from recovering on a bad faith claim. Under Alabama law, a plaintiff must prove the following in a bad faith denial of coverage claim:

"(a) an insurance contract between the parties and a breach thereof by the defendant;

---

[12] The parties' citations are very lackadaisical and often unhelpful. For instance, Golden asserts fact and cites to 30-50 pages to support a single contention. State Farm also has very generalized citations and indirectly claims to have paid for a lot of the repairs Golden contends are necessary and due to Hurricane Sally without providing succinct breakdowns of their payments – their support is merely generalizations. This made it very difficult to determine for what State Farm actually compensated Golden.
    Civil Local Rule 56(a) and (b) requires the parties to provide "a specific, pinpoint citation" to the facts relied upon in their summary judgment briefs. It is not the task of this Court to scour the record to find evidence in support of the parties positions. As noted in July v. Board of Water and Sewer Commr. of City of Mobile, 2012 WL 5966637 at note 10 (S.D. Ala. Nov. 29, 2012): "[t]he Court cannot and will not make a party's summary judgment argument for it, based on record facts that the party has not cited.... See Rule 56(c), Fed.R.Civ.P. (clarifying that parties must support their factual positions on summary judgment by 'citing to particular parts of materials in the record' and that the court 'need consider only the cited materials'); Williamson v. Clarke Cty.Dept. of Human Resources, 834 F.Supp.2d 1310, 1314 at n.2 ('The Court will not scour uncited portions of the summary judgment record for evidence that might bolster either side's arguments.')...." In sum, a party may not, by dumping evidentiary material into the record, unilaterally shift to the Court its burden of identifying evidence supporting its position.

17

> (b) an intentional refusal to pay the insured's claim;
> (c) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);
> (d) the insurer's actual knowledge of the absence of any legitimate or arguable reason;
> (e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.
> Requirements (a) through (d) represent the "normal" case. Requirement (e) represents the "abnormal" case."
>
> Employees' Benefit Ass'n v. Grissett, 732 So. 2d 968, 976 (Ala. 1998) (internal cites and quotations omitted).

"Alabama courts have made clear that, '[w]hen a claim is "fairly debatable," the insurer is entitled to debate it, whether the debate concerns a matter of fact or law.' Nat'l Sec. Fire & Cas. Co. v. Bowen, 417 So.2d 179, 183 (Ala.1982). Thus, a plaintiff seeking to prove a bad-faith claim has a heavy burden. Shelter Mut. Ins. Co. v. Barton, 822 So.2d 1149, 1154 (Ala. 2001). To establish a *prima facie* case, the plaintiff 'must show that the insurer's decision not to pay was without any ground for dispute.' Id. (quotation omitted). In so doing, the plaintiff 'must eliminate any arguable reason propounded by the insurer for refusing to pay the claim.' Id. (quotations omitted). In assessing whether the insurer had an arguable reason for denying the claim, the court must look to the information before the insurer at the time it denied the claim. See Bowen, 417 So.2d at 183." Atl. Specialty Ins. Co. v. Mr. Charlie Adventures, LLC, 644 F. App'x 922, 926 (11th Cir. 2016).

Here, State Farm hired Rimkus Engineering and its expert, Asarisi, to conduct an in depth inspection of the Property to determine which damages were attributable to Hurricane Sally. State Farm relied on the report provided by Rimkus Engineering and Asarisi in deciding which

damages to provide compensation for and which damages to dispute.[13] Thus, State Farm's position was, at a minimum, fairly debatable and Golden has not presented evidence sufficient to overcome the stringent burden a plaintiff is subject to in a bad faith failure to pay claim. Accordingly, Golden's bad faith claim fails as a matter of law.

### VI.   Conclusion

Accordingly, for the reasons set forth herein, Defendant State Farm's Motion for Summary Judgment is **DENIED** as to Count One (Count I) and **GRANTED** as to Count Two (Count II).

A Final Judgment consistent with terms of this Order shall be entered by separate document as required by Rule 58(a) of the Federal Rules of Civil Procedure.

**DONE** and **ORDERED** this the 21st day of **September 2022.**

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**

---

[13] After the Rimkus Engineering report was provided to State Farm, it included additional damages (two broken windowpanes and overhead and profit, except for the roof) and provided additional compensation to Golden.